IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MERRICK STEDMAN,         *

     Plaintiff,         *

v.         *       Civil Action No. GLR-18-1801

HOLLY PIERCE, CRNP, et al.,     *

     Defendants.

         ***

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Holly Pierce and Wexford Health Sources, Inc.'s ("Wexford") Motion to Dismiss or in the Alternative, Motion for Summary Judgment (ECF No. 11) and Plaintiff Merrick Stedman's Motion to Amend Pleadings or Consent Request to Defendants to Allow Amendment or in the Alternative Motion for Leave to Amend ("Motion to Amend") (ECF No. 15).[1] The Motions are ripe

---

[1] Also pending before the Court are: Defendants' Motion for Leave to File Pleading in Excess of 35 Pages ("Motion for Leave to File Excess Pages") (ECF No. 10); Stedman's Motion for Extension of Time ("Motion for Extension") (ECF No. 13); Stedman's Motion to Appoint Counsel (ECF No. 14); and Defendants' Motion to Strike Surreply (ECF No. 21).

Defendants' Motion for Leave to File Excess Pages is both unopposed and procedural in nature; therefore, the Court will grant the Motion.

As discussed below, see infra at 31 n.23, the Court will deny as moot Stedman's Motion for Extension.

As for Stedman's Motion to Appoint Counsel, "[a] pro se prisoner does not have a general right to counsel in a § 1983 action." Evans v. Kuplinski, 713 F.App'x 167, 170 (4th Cir. 2017). A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) (2018) is discretionary, and an indigent claimant must present "exceptional circumstances." Kuplinski, 713 F.App'x at 170; Miller v. Simmons, 814 F.2d 962, 966 (4th Cir. 1987). Exceptional circumstances exist where a "pro se litigant has a colorable claim

for disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant Defendants' Motion and deny as moot Stedman's Motion to Amend.

## I.     BACKGROUND

### A.     <u>Factual Background</u>

Merrick Stedman, a self-represented Maryland prisoner confined at North Branch Correctional Institution ("NBCI"), was transferred to NBCI on July 15, 2015. (Compl. at 5, ECF No. 1). Two days later, Dr. Mahboob Ashraf and Nurse Dawn Hawk evaluated Stedman and diagnosed him with left shoulder pain and tonsillitis. (<u>Id.</u>). Stedman was otherwise in good health. (<u>Id.</u>). However, after drinking the tap water in his cell and noticing that the water "tasted gritty," Stedman became concerned that the water was contaminated. (<u>Id.</u>). Because of his concern, Stedman wrote to the Environmental Protection Agency and the City of Cumberland, Maryland asking for water quality assessments. (<u>Id.</u>).

---

but lacks the capacity to present it." <u>See</u> <u>Whisenant v. Yuam</u>, 739 F.2d 160, 163 (4th Cir. 1984), abrogated on other grounds by <u>Mallard v. U.S. Dist. Ct.</u>, 490 U.S. 296, 298 (1989).

Upon careful consideration of the Motion as well as Stedman's previous filings, the Court finds that Stedman has demonstrated the wherewithal to either articulate the legal and factual basis of his claims himself or secure meaningful assistance in doing so. The issues pending before the Court are not unduly complicated. Therefore, there are no exceptional circumstances that would warrant the appointment of an attorney to represent Stedman under § 1915(e)(1). Accordingly, the Court will deny Stedman's Motion to Appoint Counsel.

Finally, for the reasons outlined below, <u>see</u> <u>infra</u> at 28–29 n.22, the Court will deny Defendants' Motion to Strike Surreply.

Stedman first began to get sick on or about November 25, 2015. (Id.). After discovering that the nail on his big toe had started turning grayish-white, Stedman placed a sick-call and received antibiotics for a toe infection. (Id.). Three months after completing the course of antibiotics, Stedman's cellmate was diagnosed with H-pylori. (Id.). On July 3, 2016, Stedman attended sick-call and asked the nurse whether he should be tested for H-pylori in light of his cellmate's diagnosis. (Id. at 5–6). The nurse advised Stedman that he could only contract H-pylori by "playing in feces, contaminated water[,] or food and that [he] had nothing to worry about." (Id. at 6).

Stedman began to feel ill again around September 1, 2016. (Id. at 6). On September 10, 2016, Stedman complained to Nurse Moyer about migraine headaches that were becoming more frequent and more painful. (Defs.' Mot. Dismiss Alt. Mot. Summ. J. ["Defs.' Mot."] Ex. 1 ["Medical Records"] at 1, ECF No. 11-4). During his visit on September 10, 2016, Stedman's blood pressure was slightly elevated. (Id.). Moyer referred Stedman for follow-up after two weeks of blood pressure checks. (Id. at 2). Moyer also prescribed Stedman Excedrin Migraine for pain relief. (Id.).

Stedman received blood pressure checks on September 12 and 14, 2016. (Id. at 3–6). On or about September 15, 2016, Stedman placed a sick-call slip, but did not know that he was scheduled to be seen because his name was not placed on the pass list. (Compl. at 6). Stedman received additional blood pressure checks on September 19 and 21, 2016. (Medical Records at 3–6). During the blood pressure check on September 21, 2016, Stedman reported to Nurse Hawk that he had been feeling dizzy. (Id. at 6). Although Stedman's blood pressure was elevated, his heart rate and respiration were within normal

limits. (Id.). According to Stedman's medical records, Hawk notified Stedman's provider about his elevated blood pressure, advised Stedman that he had one blood pressure check left before he would be referred to the provider, and directed Stedman to follow up if his symptoms worsened. (Id.).

Stedman attended his provider visit the following day with Krista Bilak. (Id. at 7). Bilak reported that Stedman's blood pressure monitoring showed that his blood pressure was consistently high. (Id.). As a result, Bilak educated Stedman about hypertension, added him to the chronic care clinic, and prescribed him Lisinopril.[2] (Id. at 7–8). Bilak also noted that Stedman complained of heartburn and a recurrent sore throat, so she provided him Tums and took a throat culture. (Id.).

According to Stedman, his condition continued to decline because of his chest pains. (Compl. at 6). On September 26, 2016, Stedman complained to Nurse Marilyn Evans about a sore throat and night sweats. (Id. at 6; Medical Records at 9). Stedman's tonsils were enlarged and his throat was inflamed and red. (Id.). In Stedman's medical reports, Evans noted that she consulted with Stedman's provider and they were waiting for the results of the throat culture. (Id. at 10). In the meantime, Evans provided Stedman throat lozenges, instructed him to drink fluids, and directed him to submit a sick-call slip if his symptoms changed. (Id. at 10–11). Stedman returned to sick-call on September 30, 2016, complaining of sore throat and dizziness. (Id. at 12). Stedman's medical reports note that his throat was

---

[2] Lisinopril/Prinivil is used to treat high blood pressure. See https://www.webmd.com/drugs/2/drug-6993/prinivil-oral/details (last visited Aug. 15, 2019).

inflamed, he was dizzy, and he was having difficulty swallowing. (Id.). After Stedman's throat culture tested positive for candida albians, Stedman was diagnosed with a yeast infection in his throat and was prescribed an eight-week treatment of Diflucan.[3] (Compl. at 6; Medical Records at 14; Asresahegn Getachew Aff. ["Getachew Aff."] ¶ 8, ECF No. 11-5). Stedman alleges that no one could explain to him how it was possible to contract a yeast infection in his throat. (Compl. at 6). Although Stedman's prescription for Diflucan helped clear his yeast infection, Stedman alleges that his health continued to decline. (Id.).

Stedman saw Bilak again on October 7, 2016 because he continued to feel dizziness upon standing. (Medical Records at 15). Stedman's blood pressure was within normal limits and had minimal changes when he changed positions. (Id.). Bilak directed Stedman to follow up if his condition worsened or did not improve within thirty days. (Id. at 16).

On October 15, 2016, Stedman submitted a sick-call slip complaining that his chest hurt and he was dizzy. (Id. at 17). Stedman stated he believed something was "seriously wrong" and requested lab work, including blood, urine, and stool testing. (Id.). During his evaluation on October 17, 2016, Stedman advised Nurse Evans that he had been experiencing burning in his chest for approximately one month, and that the burning came on without warning, was not brought on by food or drink, lasted for seconds, and went away on its own. (Id. at 18). Stedman's throat was slightly inflamed, but his physical examination was otherwise unremarkable. (Id.). Nurse Evans referred Stedman to his

---

[3] Diflucan/Fluconazloe is used to treat a variety of fungal and yeast infections. See https://www.webmd.com/drugs/2/drug-3774-5052/diflucan-oral/fluconazole-oral/details (last visited Aug. 15, 2019).

provider and directed him to return to sick-call if he developed symptoms of infection or his symptoms did not subside. (Id. at 19).

Stedman was transferred to the care of Defendant Holly Pierce, C.R.N.P. on or about October 20, 2016. (Compl. at 6). Nurse Practitioner Holly Pierce evaluated Stedman on October 25, 2016. (Medical Records at 19). Pierce noted that Stedman complained of fatigue, persistent sore throat, and headache, and that he had a history of high blood pressure. (Id. at 19). Stedman's tonsils were enlarged, but his respiratory and cardiovascular systems were normal. (Id.). Pierce directed that Stedman have blood pressure checks twice a week for three weeks. (Id.). Pierce prescribed Hydrochlorothiazide[4] ("HCTZ") to treat Stedman's hypertension, but left Stedman's previous prescription for Prinivil in place. (Id.). Pierce also discontinued Stedman's prescription for Diflucan and instead prescribed Nystatin[5] to treat his throat. (Id.). Additionally, Pierce ordered another throat culture, a complete blood count with differential, a comprehensive metabolic panel, and a test of Stedman's thyroid levels. (Id.). Stedman was scheduled for follow-up with a provider in two weeks. (Id.). Stedman's throat culture came back normal and his complete blood count showed low neutrophil and high lymphocyte counts. (Id. at 22, 25).

---

[4]     Hydrochlorothiazide is a diuretic used to treat high blood pressure. See https://www.webmd.com/drugs/2/drug-5310/hydrochlorothiazide-oral/details (last visited Aug. 15, 2019).

[5]     Nystatin is a medication used to treat fungal infections of the mouth. See https://www.webmd.com/drugs/2/drug-8893-8206/nystatin-oral/nystatin-suspension-oral/details (last visited Aug. 15, 2019).

On October 30, 2016, Stedman met with Nurse Hawk in response to his inquiry about blood pressure checks. (Id. at 23). Stedman advised the nurse that he was supposed to receive blood pressure checks and reported that he felt he had an irregular heartbeat. (Id.). The nurse advised Stedman that blood pressure checks had been ordered and were to begin the following day. (Id.). The nurse also noted that while listening to Stedman's heart for two minutes, his heart rate sped up for approximately two to five seconds on one occasion but then returned to normal. (Id.). The nurse then contacted Stedman's provider for further treatment and orders. (Id. at 23–24).

After Stedman placed numerous sick-calls complaining about his chest and head, Nurse Practitioner Holly Pierce evaluated Stedman on November 1, 2016. (Compl. at 6; Medical Records at 27). During this visit, Stedman reported that he was suffering from dizziness and heart palpitations. (Medical Records at 27). Stedman's physical exam revealed a slightly elevated heart rate, but his results were otherwise normal.[6] (Getachew Aff. ¶ 11). Pierce ordered that Stedman's prescription for HCTZ be decreased by half and ordered an EKG. (Medical Records at 27–28).

Stedman underwent an EKG on November 13, 2016. (Compl. at 6; Medical Records at 29). Stedman's medical records indicate the EKG showed a "left ventricular hypertrophy ["LVH"] with repolarization abnormality," but otherwise normal sinus rhythm and no significant abnormalities. (Id.). Stedman alleges that the EKG reader told him he had an

---

[6] Although Stedman disputes that he was given a physical exam, (Pl.'s Resp. Opp'n Defs.' Mot. Dismiss ["Pl.'s Opp'n"] at 1, ECF No. 17), the Court is entitled to rely on the medical records made and maintained in the ordinary course of business, Bennett v. Reed, 534 F. Supp. 83, 86 (E.D.N.C. 1981), aff'd, 67 F.2d 690 (4th Cir. 1982).

abnormal reading and that a provider would speak with Stedman that day. (Compl. at 6–7). When Stedman did not hear from a provider about his results, he placed a sick-call slip. (Id. at 7). Stedman also placed a sick-call slip on November 23, 2016, requesting the results of his EKG. (Id.). Pierce reviewed the lab results with Stedman on November 17 and 28, 2016, informing Stedman that LVH with repolarization abnormality does not require any treatment.[7] (Medical Records at 30, 33). According to Stedman, Pierce told him that his EKG results were normal and the EKG technician who told Stedman he had abnormal results "did not know what she was talking about." (Compl. at 7). Stedman asserts that "[w]hat [Pierce] said, how she said it[,] and how she looked [were] sketchy" to him. (Id.).

On December 6, 2016, Stedman submitted a sick-call slip with a note directed to Pierce that read: "I am not requesting to see [Pierce] . . . [but] I need you to listen to what I'm saying to you so that you can provide me with better care." (Medical Records at 35–36). In his note, Stedman disputed Pierce's explanation that his dizziness was caused by the blood pressure medication, explaining that that his symptoms of dizziness and difficulty walking began before he started taking the blood pressure medication. (Id. at 36; see also Compl. at 7). Stedman asked Pierce to refer him to a doctor who specialized in his symptoms. (Medical Records at 36).

Pierce evaluated Stedman on December 8, 2016. (Id. at 37). According to his medical records, Stedman had a hacking cough, a dull tympanic membrane in his right ear,

---

[7] Stedman disputes that Pierce told him that "LVH with repolarization abnormality that did not require any treatment." (Pl.'s Opp'n at 1). Dr. Getachew avers that the EKG result did not require any treatment.  (Getachew Aff. ¶ 13).

tender sinuses, and moderately enlarged tonsils and left and right turbinate.[8] (Id.). Stedman said he felt light-headed and explained that his symptoms were aggravated when he got out of bed and when he rose rapidly. (Id.). Pierce prescribed Stedman Zyrtec, Nasacort,[9] Prednisone, and Norvasc.[10] (Id. at 38). Pierce left in place Stedman's prescription for HCTZ, but discontinued the Lisinopril/Prinivil prescription due to Stedman's cough. (Id.). Pierce ordered another throat culture and directed Stedman to follow up in two weeks. (Id.).

On December 8, 2016, Stedman filed an Administrative Remedy Procedure ("ARP") against Pierce, alleging that Pierce discussed Stedman's possible medical condition with an officer. (Compl. at 7–8).

On December 13, 2016, Stedman presented to the medical unit by wheelchair after reporting chest pains and dizziness. (Medical Records at 39). Nurse Tammy Buser provided Maalox and performed an EKG. (Id.). The results of the EKG showed no change from Stedman's previous EKG. (Id. at 39, 41). The following day, Dr. Ashraf evaluated Stedman for ongoing migraine headaches and dizziness. (Id. at 42). Stedman's blood pressure, tympanic membranes, mouth, and throat were normal. (Id. at 42, 43). Dr. Ashraf

---

[8] "[N]asal turbinates are long, narrow passageways that help to warm and moisten the air that flows in through the nose . . . . If the turbinates are too large, they can actually block airflow. Doctors call this condition turbinate hypertrophy. This condition can cause breathing problems, frequent infections and nosebleeds." See https://www.healthline.com/health/turbinate-hypertrophy (last visited Aug. 15, 2019).

[9] Nasacort is a non-formulary medication, so the request for the drug was ultimately not submitted. After filing numerous sick-call slips and an Administrative Remedy Procedure ("ARP") requesting the medication, (Compl. at 8–9), Stedman received the prescription on January 4, 2017, (Compl. Ex. 10) (filed separately).

[10] Norvasc/amlodipine is used to treat high blood pressure. See https://www.drugs.com/norvasc.html (last visited Aug. 15, 2019).

noted that Stedman's prescription for Lisinopril had been discontinued due to side effects and substituted with Norvasc, but that Stedman had stopped taking Norvasc "because it was not helping him." (Id. at 42). Dr. Ashraf also noted that Stedman was on 12.5-milligram dose of HCTZ per day, and that Stedman had stopped taking Prednisone[11] for his allergies because it "made his symptoms worse[n]." (Id.). Dr. Ashraf ordered a blood and lipid panel. (Id.). Later the same day, Stedman submitted a sick-call slip indicating that the pressure in his head worsened and requesting an MRI. (Id. at 46). On his sick-call slip, Stedman complained that the medical department had been playing a "guessing game about [his] possible illness now for approximately 3 months." (Id. at 47). Stedman also requested to be placed back on daily blood pressure checks. (Id.).

On December 20, 2016, Pierce and regional medical director Dr. Akal evaluated Stedman. (Id. at 48). Stedman again complained of lightheadedness, but denied having chest pain, ear ache, or headache. (Id.). Stedman states he was surprised to learn during this visit that his sinus issue was the result of mucus draining in the back of his throat, but that Pierce could not say whether this caused Stedman's yeast infection. (Compl. at 8). Stedman had elevated blood pressure during this visit. (Medical Records at 48). Stedman's medical records note that Stedman's EKG showed a normal sinus rhythm with "[l]eft ventricular hypertrophy with repolarization abnormality." (Id.). Pierce and Dr. Akal referred Stedman to a cardiologist and instructed him to avoid exercise until his cardiology appointment. (Id.). Pierce and Dr. Akal also prescribed Stedman 25 milligrams of

---

[11] Stedman attributes his illness to taking Prednisone. (Pl.'s Opp'n at 2). Nothing in the record attributes his ailments to the Prednisone.

Metoprolol Tartrate.[12] (Id. at 49). Pierce submitted a consultation request for a CT scan on January 5, 2017. (Id. at 50).

On January 9, 2017, Dr. Barrera evaluated Stedman for nasal drip in the back of his throat. (Id. at 53). Dr. Barrera provided Stedman cold medication and directed him to rest and drink plenty of water. (Id.). On January 13, 2017, a note was entered into Stedman's medical record reflecting the collegial decision to postpone his CT scan until after the cardiology telemedicine was completed. (Id. at 57). On January 14, 2017, the results of Stedman's blood work showed that he had high levels of cholesterol and triglycerides. (Id. at 55). Stedman also tested positive for H-pylori. (Id. at 56). On January 19, 2017, Pierce advised Stedman of the results of his blood work and the collegial decision to delay his CT scan. (Id. at 58). Stedman alleges he was "surprise[d]" at his H-pylori results because he "wasn't even aware that [he] was being tested for the bacteria" and his past concerns about H-pylori had been dismissed. (Compl. at 9). Pierce prescribed Stedman antibiotics to treat H-pylori. (Medical Records at 58). According to Stedman, Pierce instructed him to follow up "in a couple weeks" and provide a stool sample to assess the efficacy of the antibiotic treatment, but despite submitting multiple sick-call slips, Stedman was not re-tested until May 2, 2017. (Compl. at 10).

On February 8, 2017, Pierce evaluated Stedman for ongoing dizziness and lightheadedness. (Medical Records at 61). Pierce once again advised Stedman that he

---

[12]    Metoprolol is used to treat hypertension. See https://www.drugs.com/metoprolol.html (last visited Aug. 19, 2019).

would be referred to a cardiologist and that he should avoid exercise until that time. (Id.). Stedman's vital signs and physical exam were normal. (Id.).

Cardiologist Dr. Ashok Chopra evaluated Stedman on February 13, 2017. (Id. at 63–69). Dr. Chopra noted that Stedman's dizziness was likely "due to orthostatic hypotension."[13] (Id. at 63). Dr. Chopra directed Stedman stop taking the diuretic and ordered blood pressure monitoring. (Id.). Additionally, Dr. Chopra remarked: "Check Echo and Stress test as marked EKG abnormality. Neuro eval In progress in view of headaches and dizziness." (Id.). Dr. Chopra directed Stedman to follow up in six weeks, recommended a statin drug[14] to treat Stedman's elevated lipid levels, and suggested a follow-up lipid panel. (Id.). On that same day, Pierce submitted a consultation request for the additional testing recommended by Dr. Chopra. (Id. at 70). The requests for the echocardiogram and stress tests were approved on February 16, 2017. (Id. at 72).

On February 18, 2017, Stedman reported to Nurse Baker that he still needed the CT scan of his head. (Id. at 73). Baker advised Stedman that the scan was on hold pending the cardiology consult. (Id.). Baker also advised him that the additional testing requested by Dr. Chopra was pending. (Id.). Baker indicated she would follow up regarding the need for daily blood pressure checks. (Id.). On February 20, 2017, Pierce entered a chart update that

_____

[13] Orthostatic hypotension is a condition where a person's blood pressure falls significantly upon standing up quickly. See https://my.clevelandclinic.org/health/diseases/9385-orthostatic-hypotension (last visited (last visited Aug. 19, 2019).

[14] In regard to the recommendation that a statin drug be prescribed, Dr. Getachew notes that "a trial of lifestyle modification had been previously implemented and would be continued to address [Stedman's] elevated cholesterol levels before adding medication." (Getachew Aff. ¶ 19).

Stedman was to receive blood pressure checks three times a week for three weeks.[15] (Id. at 75).

Stedman submitted a sick-call slip on February 27, 2017, complaining of increased dizziness, confusion, pressure in his head, and labored breathing. (Id. at 76). Stedman indicated that although his treatment with HCTZ had been discontinued, he had started taking it again the day before submitting his sick-call slip. (Id. at 77). Pierce evaluated Stedman on March 1, 2017 for his ongoing complaints of light headedness. (Id. at 78). Stedman's vital signs were within normal limits and his physical examination was unremarkable. (Id.). Pierce noted that the cardiologist had requested a stress and echo test for Stedman. (Id.). Pierce encouraged Stedman to increase fluids and to avoid exercising and quick movements. (Id.).

Nurse Cottrell evaluated Stedman on March 12, 2017. (Id. at 80). At that time, Stedman requested an H-pylori test and inquired about the status of his echocardiogram and stress test. (Id.). Stedman also requested a prescription for HCTZ. (Id.). Cottrell referred Stedman to the provider. (Id.). On March 20, 2017, Stedman met with Pierce, who advised him that the echocardiogram and stress tests had been approved and their scheduling was pending. (Id. at 82). Stedman underwent a stress test and echocardiogram on March 22, 2017. (Id. at 83–86). The stress test showed "an appropriate heartrate and

---

[15] On March 20, 2017, Stedman filed an ARP indicating he had not received the Prilosec prescribed to him on January 19, 2017. The ARP review found that while Stedman had been prescribed Prilosec there was no indication that he had received it. As a result, nursing staff were re-educated on documenting and processing the handing out of medication. (Compl. Ex. 15) (filed separately).

blood pressure response to exercise." (Getachew Aff. ¶ 21). Stedman's echocardiogram showed "mild concentric left ventricular hypertrophy" with an ejection fraction of 65–70%, mild dilation of the left atrium, unremarkable valves, and impaired LV relaxation. (Medical Records at 86).

On March 30, 2017, Pierce evaluated Stedman for complaints of dizziness, headaches, and heart palpations. (Id. at 91). At that time, Stedman requested a neurology consultation. (Id.). Pierce reviewed the results of the cardiology testing with Stedman and noted a follow-up with the cardiologist had been requested. (Id.). Pierce also reviewed Stedman's history of failed treatment for headaches and renewed the request for CT scan of the head. (Id.). On April 5, 2017, Pierce entered a chart update requesting blood work for Stedman. (Id. at 93).

On April 6, 2017, Dr. Ashraf evaluated Stedman for complaints of headache pressure, dizziness, and bilateral earache. (Id. at 94). Dr. Ashraf noted that the results of Stedman's echocardiogram and stress test were normal and that Stedman denied any cardiac symptoms or distress. (Id.). Dr. Ashraf also noted that another provider had twice recommended a CT scan of the head, but the requests had been denied on collegial review. (Id.). Dr. Ashraf advised Stedman to take Meclizine and Topamax daily. (Id.). Dr. Ashraf also provided Stedman ear drops and assured him that his providers would continue to treat Stedman's symptoms even if the request for a CT scan was denied again. (Id.).

Stedman had another EKG on April 23, 2017, which again noted LVH. (Id. at 99–100). Dr. Ashraf saw Stedman again on April 26, 2017 for Stedman's continued migraines. (Id. at 101). Dr. Ashraf noted that the two previous requests for a CT scan had been denied

14

by the collegial review process, but indicated he would "send a reminder to the collegial" to "reconsider" their denial of the CT scan. (Id.). Dr. Ashraf also noted that the request for consultation with the cardiologist had been approved and that Stedman's providers would follow the cardiologist's recommendations after Stedman's follow-up consultation. (Id.).

On May 2, 2017, Pierce evaluated Stedman for complaints of ear infection and head pressure. (Id. at 104). At that time, Stedman denied pain or dizziness but complained of pressure behind his eye. (Id.). Stedman told Pierce that the medical staff did not know what they were doing and that he needed to see a neurologist. (Id.). Stedman indicated "he wants off Topamax as he is not taking it." (Id.). Stedman also stated that he was told he had an ear infection but did not receive the medication and the "painless infection" was out of control. (Id.). Pierce discontinued the Topamax at Stedman's request and placed an order for Excedrin Migraine. (Id.). Pierce did not prescribe an antibiotic. (Id.). Pierce also noted that the cardiology follow-up was pending, and that the request for a CT scan of the head had been denied three times. (Id.). Finally, Pierce requested an optometry exam. (Id.).

On May 6, 2017, Stedman's laboratory test results showed that his April 27, 2017 and May 3, 2017 stool samples were negative for H-pylori. (Id. at 106–07). On May 8, 2017, Stedman's telemedicine appointment was canceled due to a security issue. (Id. at 108). Pierce requested that the appointment be rescheduled. (Id.).

On May 22, 2017, Dr. Chopra evaluated Stedman for complaints of fullness in both ears and headaches. (Id. at 109–11). No acute symptoms were present at that time. (Id. at 109). Dr. Chopra noted that HCTZ had been discontinued as of the last visit, described the results of Stedman's stress test and echocardiogram as "satisfactory," and indicated that

Stedman's dizziness was not related to cardiac abnormality. (Id.). Dr. Chopra recommended that Stedman lose weight, take a "statin" to treat high cholesterol, receive a follow-up lipid panel in six weeks, and follow up with the cardiologist in four months. (Id. at 111). Dr. Chopra also recommended an ENT evaluation. (Id.). Stedman asked Dr. Chopra whether he had recommended evaluation by a neurologist during Stedman's last visit, but Dr. Chopra advised that the medical staff at NBCI could manage Stedman's symptoms. (Id.). Stedman disagreed, remarking that his symptoms had been present for "years with no relief." (Id.). Dr. Chopra advised he could recommend a neurologist only after Stedman's consultation with an ENT, if needed. (Id.).

As a result of the May 22, 2017 consultation, and after discussing Stedman's case with the Regional Medical Director, Pierce placed an order for Pravastatin, discontinued Metoprolol Tartrate, and placed an order for Propranolol. (Id.). Pierce also indicated that referral to an ENT for dizziness was "not indicated" as Stedman was not compliant with his treatment plan in that he declined Topamax and was not taking Meclizine every day as prescribed. (Id.). Additionally, Pierce noted that returning to the cardiologist in four months was "not indicated at this time" for Stedman. (Id.). Pierce directed that Stedman's medications be issued as directly observed therapy ("DOT") instead of issuing him a blister pack to self-administer. (Id.). Pierce also ordered an x-ray of Stedman's sinuses and noted the optometry exam remained pending. (Id. at 111, 114). Stedman was scheduled for follow-up in one week. (Id. at 111).

On May 25, 2017, Stedman's laboratory test results showed that his May 23, 2017 stool samples were positive for H-pylori. (<u>Id.</u> at 113). A handwritten note on the results indicates "*wrong test* stool is negative." (<u>Id.</u>).

On May 25, 2017, an x-ray of Stedman's face and sinuses showed no abnormalities. (<u>Id.</u> at 115).

On May 29, 2017, Dr. Ashraf evaluated Stedman for complaints of headache and ear pressure radiating towards the jaw. (<u>Id.</u> at 116). Stedman informed Dr. Ashraf about his frustration that nothing was being done with the CT scan or ENT referral. (<u>Id.</u>). On examination, both of Stedman's ears showed signs of infection. (<u>Id.</u>). Dr. Ashraf prescribed Stedman amoxicillin and Neomycin. (<u>Id.</u>). After Stedman told Dr. Ashraf that he had not received the medicine that had been prescribed to him, Dr. Ashraf called the pharmacy, which indicated that Stedman would receive the amoxicillin that day but that the Neomycin ear drops were non-formulary. (<u>Id.</u>). As a result, Dr. Ashraf submitted a non-formulary drug request for the ear drops the same day. (<u>Id.</u> at 119–20).

On June 14, 2017, Stedman received an optometry examination. (<u>Id.</u> at 122). The following day, Nurse Practitioner Krista Self evaluated Stedman. (<u>Id.</u> at 123). Self noted that Stedman requested to see an ENT but there was no indication for Stedman to see one. (<u>Id.</u>). Self also noted that while Stedman had various complaints over time, the results of multiple diagnostic studies were unremarkable. (<u>Id.</u>). Self educated Stedman on vertigo, but Stedman disagreed with the diagnosis and plan of care. (<u>Id.</u>). Stedman declined Meclizine to treat vertigo and again requested a consultation with an ENT or neurologist. (<u>Id.</u>).

On July 14, 2017, Dr. Ashraf evaluated Stedman and informed him that he had tested positive for hepatitis B. (Id. at 127). Dr. Ashraf explained to Stedman the result of the hepatitis test, which required no treatment. (Id.). At that time, Stedman informed Dr. Ashraf about his issues with recurrent head and ear aches. (Id.; see also Getachew Aff. ¶ 26). Examination of Stedman's ears was negative for infection but positive for wax build up. (Medical Records at 127). Dr. Ashraf prescribed Stedman ear drops. (Id.).

Regional Medical Director Ava Joubert-Curtis examined Stedman on July 17, 2017. (Id. at 132). At that time, Stedman presented an affidavit listing his medical concerns and threatening to file suit. (Id.). Stedman explained his belief that the nurse practitioner had sabotaged his care after he submitted an ARP about medication she was supposed to have prescribed but which he did not receive. (Id.). Dr. Joubert-Curtis noted that she addressed each of Stedman's concerns and highlighted "the elevated [blood pressure] and the evidence of chronic sinusitis on exam (despite neg x-ray of the sinuses)." (Id.). Dr. Joubert-Curtis indicated she would request a CT scan for Stedman's head. (Id.). Examination showed that Stedman's ears were normal, but his sinuses had "very swollen turbinates" and his tonsils were enlarged. (Id. at 134). Additionally, Dr. Joubert Curtis noted:

> Headaches appear to be multifactorial, including hypertensive and [c]hronic sinus disease. However due to the nature of the headaches, neg sinus x-rays and headaches when BP appears to be normal, will pursue CT r/o other vascular abno[rmalities]. The hypertension appears to be more of a chronic persistent nature considering the LVH pattern on the EKG. He has seen the Retinal screening specialist. This provider is not able to interpret the findings. However, there does not appear to be any recommendations made. We are stopping the excedrin migraine due to the caffeine in it (elevates BP) and adding ARB [Hyzaar] to help control the BP and will follow him weekly x 4 to monitor BP control. Additionally, he says he has BP mediation in his cell...although all meds (except prilosec) were written as DOT???

(Id. at 134–35).

Stedman underwent a CT scan of the head on August 4, 2017. (Id. at 139). Dr. Joubert-Curtis met with Stedman on August 7, 2017 to review the results of the CT scan. (Id. at 140). Stedman requested to stop Propranolol and reinstate Metoprolol because Metoprolol had previously kept his blood pressure within the normal range. (Id.). Dr. Joubert-Curtis made the prescription changes as Stedman requested. (Id. at 141). Additionally, Dr. Joubert-Curtis advised Stedman that his progressive weight gain and salt intake could explain why it had been difficult to keep his blood pressure within normal limits. (Id.). Stedman admitted to continuing to eat noodles despite being advised of the effect on his blood pressure. (Id.). Although Stedman's electronic medical record was not accessible during the visit, Dr. Joubert-Curtis noted that she reviewed the CT scan and labs after the visit. (Id.). After reviewing the CT scan and labs, Dr. Joubert-Curtis indicated that the CT scan was normal, and while Stedman's hepatitis test indicated a previous exposure to hepatitis, he did not have active hepatitis and therefore did not require treatment. (Id.).

Krista Self saw Stedman for a routine health assessment on August 7, 2017. (Id. at 143). Self ordered blood work and metabolic panel for Stedman at that time. (Id. at 145).

Dr. Joubert-Curtis evaluated Stedman again on August 14, 2017. (Id. at 146). Stedman advised Dr. Joubert-Curtis that he had been feeling much better after using the Metoprolol until three days before the exam when he felt "off" and like there were hot coals on his chest for about one minute. (Id.). Stedman noted he did not have any other

symptoms before or since. (Id.). Stedman's physical exam was normal at that time. (Id.). Dr. Joubert-Curtis explained to Stedman that his CT scan was normal. (Id.).

Stedman did not submit any other complaints until September 22, 2017, when he submitted a sick-call slip complaining about pain and spasms in his ears and requesting to see an ENT. (Id. at 148). In response to the sick-call slip, Dr. Joubert-Curtis saw him on October 2, 2017. (Id. at 149). Stedman reported that he had been taking his blood pressure medication but was concerned because he occasionally got "sharp chest pain." (Id.). Additionally, Stedman continued to complain of problems with his ears and pressure in his head. (Id.). Dr. Joubert-Curtis reminded Stedman that his symptoms could be due to allergies affecting the inner ear, but informed Stedman that his physical examination and CT scan were otherwise normal. Stedman's physical examination was normal at that time. (Id. at 149, 150). Stedman became upset and denied he had allergies, complained that his health problems had been going on too long without answers, and insisted on seeing an ENT. (Id. at 150). After becoming increasingly loud, Dr. Joubert-Curtis ended the visit and had Stedman escorted out.[16] (Id.). Dr. Joubert-Curtis noted she would send Stedman a letter suggesting a trial of steroids and that she would see him for follow up. (Id.). The same day, Dr. Joubert-Curtis sent a letter describing the inflammation of Stedman's inner ear and indicating that she ordered Stedman to take a steroid in a tapering fashion. (Id. at 152). Additionally, Dr. Joubert-Curtis contacted the radiologist who read Stedman's CT asking

_____

[16] Stedman indicates that "Dr. Joubert, was attempting to harm [him]. She prescribed a massive amount of medication that have already sent the plaintiff to medical department in an emergency condition." (Pl.'s Opp'n at 5).

for a second look at the ear region and sinuses, but the radiologist confirmed that Stedman's sinuses were clear and there were no abnormalities in his ears. (Id. at 149).

On October 11, 2017, Stedman filed a sick-call slip requesting renewal of his prescription for blood pressure medication, which was due to expire on October 14, 2017. (Id. at 153). Stedman was scheduled to see Pierce on October 19, 2017 for renewal of his medication,[17] but he refused to be seen by her, signing a release of responsibility form and stating, "Provider Peirce [has] fabricated several sick call[s] that I have attended to my detriment. I wish to have another provider treat me to avoid any misunderstandings." (Id. at 149; Getachew Aff. ¶ 33; Defs.' Mot. Ex. 3 ["Pierce Aff."] ¶ 7, ECF No. 11-6). Stedman was advised of the risks of refusing his appointment.[18] (Id. at 149).

Dr. Getachew explains that inmates who receive medication:

> are advised to submit a sick call slip well in advance of the expiration date of any medication to ensure they will be seen in adequate time to avoid any interruptions in the delivery of their medication. Inmates are provided with sticker documentation for each medication they are prescribed informing them of the date of expiration of their medications. The sticker documentation is to be affixed to the sick call to obtain renewal or refill. The inmate may also hand write the information related to the medication on the sick call slip they submit. Inmates are aware that refusing or failing to appear for a medical visit for evaluation for medical renewal can result in interruptions of the delivery of their medications.

(Getachew Aff. ¶ 50).

---

[17] Stedman submitted a sick-call slip on October 17, 2017, requesting to be seen by Dr. Joubert to discuss his ongoing health concerns and to receive a referral to an ENT. (Pl.'s Mar. 14, 2019 Correspondence ["Pl.'s Surreply"], ECF No. 20) The slip did not indicate his prescription had expired. (Id.).

[18] Stedman reports that this was not a scheduled visit but was in response to his sick-call slip asking to see Dr. Joubert. (Pl.'s Opp'n at 5). He does not dispute that when he learned he was scheduled to see Pierce, he refused the visit. (Id.).

On November 9, 2017, Stedman had a patient care conference with Clinical Pharmacist Naee E. Odifie regarding medication recommendations and to address Stedman's complaint that he was not receiving his hypertension medication. (Getachew Aff. ¶ 34). After the conference, Odifie entered a note reading: "Pharmacy records show Metoprolol was dispensed and delivered 9/7/17. EPHR records show Metoprolol order expired 10/14/17. Also noted in patient's chart is abnormal blood lipid levels back in January 2017. Pravastatin 20 qhs was initiated 5/22/17 after lifestyle modification had failed. This medication order was renewed 7/14/17 through 10/14/17." (Medical Records at 155). Odifie recommended renewal of Stedman's blood pressure medication and statin to treat his high cholesterol. (Id.).

On November 10, 2017, Pierce submitted a consultation request for Stedman to meet with an ENT. (Id. at 157). On November 16, 2017, collegial review denied the request in light of the results of Stedman's CT scan, which showed no ear or sinus abnormalities. (Id. at 159). The collegial review recommended continuation of conservative care. (Id.).

On December 29, 2017, Stedman submitted a sick-call slip indicating that his blood pressure medication had been stopped on October 14, 2017 and asking for an explanation of who stopped it and why. (Id. at 160). This was the first sick-call slip Stedman submitted since his blood pressure medication expired on October 17, 2017. (Getachew Aff. ¶ 36).

Pierce saw Stedman on January 3, 2018 in response to Stedman's request for a refill of his blood pressure medication. (Medical Records at 161; Pierce Aff. ¶ 8). Stedman informed Pierce that he was requesting renewal of his prescription for Metoprolol Tartrate 25 milligram and asked who stopped his blood pressure medication and why. (Medical

Records at 161). Pierce advised Stedman that he had refused his last appointment. (Id.). Stedman left the room at that time. (Id.). Pierce then renewed Stedman's prescription for Metoprolol. (Id.).

Dr. Ashraf examined Stedman on January 5, 2018. (Id. at 163). During the visit, Dr. Ashraf explained to Stedman that the request for an ENT consultation was denied in favor of conservative care because Stedman's CT scan results were normal.[19] (Id.). Dr. Ashraf advised Stedman that he could use nasal spray for allergic rhinitis. (Id.). Stedman requested Excedrin Migraine for headaches, which Dr. Ashraf ordered. (Id.).

On February 6, 2018, Pierce evaluated Stedman for occasional dizziness and head pressure. (Id. at 168). Stedman again reported his unhappiness with his treatment plan and requested to see a specialist. (Id.). Examination of his nose, mouth, and ears were normal and his vital signs were also within normal limits. (Id.). Stedman reported that he was taking 25 milligrams of Metoprolol twice daily; three tabs of 200-milligram Guaifenesin three times per day; and Excedrin Migraine and Tylenol as needed. (Id.). Stedman indicated that he was not taking Prilosec or Hyzaar and requested that they be discontinued. (Id.). Stedman also complained of left shoulder pain. (Id.). Pierce directed Stedman to stop taking Guaifenesin and use Nasacort as prescribed. (Id. at 169). Additionally, Pierce ordered an

_____

[19] Stedman indicates he was not aware of an alternative treatment plan and that Dr. Ashraf could not explain what that plan was. (Pl.'s Opp'n at 6). Stedman also advised Ashraf that he had not received Claritin. (Id.). Thereafter, Stedman indicates Ashraf renewed "almost every medication the plaintiff was on in 2017" and when Stedman was called for the medication he accepted "what was usable and didn't sign for the rest." (Id.).

x-ray of Stedman's shoulder.  (Id. at 168, 170). The shoulder x-ray showed no abnormality. (Id. at 171).

Nurse Mast evaluated Stedman on March 11, 2018 for his complaint of bilateral ear pain. (Id. at 173). Stedman indicated he felt that his ears were clogged. (Id.). Mast did not find any wax in Stedman's left ear, but reported an excessive amount of wax in his right ear. (Id.). Mast applied softener drops and flushed Stedman's ears. (Id.). Stedman also indicated he was concerned about his cholesterol medication. (Id.). Mast spoke with Pierce about Stedman's concern, and Pierce directed Stedman to have a lipid check and follow up for the results. (Id.).

Mast evaluated Stedman again on April 4, 2018 for complaints of numbness in his index finger, toe, and head.  (Id. at 175). Stedman reported that he went outside and noticed his index finger was going numb; a couple of weeks earlier his toes went numb; and on an unspecified date, while he was exercising, his head became numb. (Id.). Stedman advised Mast that the numbness happened in the cold and expressed concern about his past cardiology issues and the need for follow up. (Id.). Stedman's examination was unremarkable at that time. (Id.).

Pierce evaluated Stedman on April 15, 2018 for his complaints of dizziness and head pressure. (Id. at 177). Dr. Getachew reviewed Stedman's case and recommended Meclizine for dizziness and a neurology consultation. (Id.). Stedman again declined Topamax for migraines, reporting that it did not work for him. (Id.). Pierce submitted the request for a neurology consultation the same day.  (Id. at 179).

Stedman returned to the medical department on April 28, 2018, inquiring about the results of his lab tests and whether he had been approved to see a neurologist. (Id. at 181). Nurse Regina Lease informed Pierce about the laboratory results and Pierce ordered a prescription statin for Stedman. (Id.). Lease advised Stedman of the results and the change in his medication. (Id.). Lease also advised him that the request for consultation with a neurologist had been submitted but it was unclear whether it had been approved. (Id.). On May 3, 2018, Nurse Beeman advised Stedman that the neurology consult had been approved and they were awaiting its scheduling. (Id. at 183). On May 15, 2018, Stedman met with Nurse Lease due to his concerns that his blood pressure medication needed to be refilled. (Id. at 184). Nurse Lease contacted Stedman's provider, who ordered renewal of the medication. (Id.).

Stedman was scheduled for a telemedicine conference with a neurologist on June 20, 2018 but Stedman refused the consultation, claiming, "The last doctor I seen was very specific that I was to see a neurologist in person." (Id. at 186). Pierce attempted to explain that Stedman would in fact see the neurologist on the telescreen, but Stedman objected, stating, "it was very specific! The US Marshall will have served by Friday!" (Id.). Pierce ended the visit due to safety concerns. (Id.).

Nurse Shively evaluated Stedman on June 28, 2018 for complaints of chest discomfort. (Id. at 188). Stedman reported that he took his blood pressure medication but had not met with a cardiologist even though he was supposed to have a follow-up. (Id.). Shively referred Stedman to a provider. (Id. at 189).

A nurse evaluated Stedman on August 17, 2018 for complaints of ear fullness and dizziness. (Id. at 190). Stedman indicated he had tried allergy medications without relief; complained of intermittent sharp, needle like pain in the middle of his chest; and reported that he needed to be seen by the neurologist. (Id.). The nurse reported fluid behind Stedman's left tympanic membrane, but noted there was no evidence of infection. (Id.). The nurse referred Stedman to the provider, which Stedman requested not be Pierce, if possible. (Id.).

On October 5, 2018, a nurse met with Stedman after he reported putting in several sick-call slips to refill his blood pressure medication and complained that he had been without blood pressure or cholesterol medication for one month. (Id. at 192). The nurse renewed Stedman's blood pressure medication for one month and referred him to a provider. (Id.).

Dr. Getachew examined Stedman via telemedicine on October 8, 2018. (Id. at 193). Dr. Getachew noted Stedman had a history of hypertension, hyperlipidemia, and sinus congestion. (Id.). Stedman had elevated blood pressure, as he had been without his blood pressure medication for a few weeks. (Id.). Stedman reported he had no chest pain, shortness of breath, headache, or leg swelling, and reported being able to do one hour of calisthenics daily without problem. (Id.). Dr. Getachew renewed Stedman's blood pressure medication and again counseled him on reducing salt in his diet. (Id.). Dr. Getachew noted that although there was insufficient evidence that Stedman would benefit from the statin given his age, Dr. Getachew would not discontinue Pravachol because Stedman had been on it "for a while." (Id.). Dr. Getachew ordered a new lipid profile and indicated he would

determine whether Stedman needed to be on statin in the future. (Id. at 193, 194). Dr. Getachew directed Stedman to follow up in ninety days. (Id. at 195). Dr. Getachew also renewed Stedman's prescriptions for Nasacort and Claritin to alleviate his sinus pain and educated Stedman about allergy and sinus congestion. (Id. at 193).

On November 8, 2018, a nurse evaluated Stedman for complaints of ear discomfort. (Id. at 200). At that time, Stedman's ear canals were clear of possible inflammation. (Id.). The nurse advised Stedman to continue with his allergy medications and referred him to a provider. (Id.). On December 8, 2018, a nurse evaluated Stedman due to complaints of nose bleeds. (Id. at 202). The nurse reported small bleeds in Stedman's turbinates and post nasal drainage. (Id.). The nurse also referred Stedman to a provider. (Id.).

## B.    **Procedural History**

On June 18, 2018, Stedman filed suit against Defendants Pierce and Wexford[20] under 42 U.S.C. § 1983 (2018), alleging that: (1) Defendants retaliated against Stedman in violation of the First Amendment to the U.S. Constitution; and (2) Defendants denied Stedman constitutionally adequate medical care in violation of the Eighth Amendment to the U.S. Constitution; and (3) Pierce violated Stedman's rights under the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. §§ 1320d et seq. (2018), by discussing Stedman's medical information with a prison guard. (Compl. at 11). Stedman asks the Court to order Wexford to arrange for Stedman to see an ENT. (Id. at 15).

---

[20] The Clerk inadvertently listed Crestpointe Corporate Center, which is the name of the building in which Wexford's office is located, on the docket as a Defendant in this case. (See Compl. at 1). As such, Crestpointe Corporate Center is dismissed as a Defendant.

On January 28, 2019, the Court received Stedman's Motion to Amend, which alleged that Wexford's custom or practice caused Stedman's constitutional injuries and sought to add Warden Bishop as an additional defendant in this case. (ECF No. 15).[21] Defendants filed an Opposition to Stedman's Motion to Amend on January 30, 2019. (ECF No. 16).

On December 28, 2018, Defendants filed their Motion to Dismiss or in the Alternative, Motion for Summary Judgment. (ECF No. 11). On February 4, 2019, Stedman filed an Opposition to Defendants' Motion. (ECF No. 17). Defendants filed their Reply on February 14, 2019. (ECF No. 18). Stedman filed a Surreply on March 14, 2019. (ECF No. 20). [22]

---

[21] For the reasons outlined below, see infra Section II.A, the Court will accept the additional claims in Stedman's Motion to Amend as a matter of course and deny Stedman's Motion to Amend as moot.

[22] Although docketed as "Correspondence from Plaintiff re: Declaration of Merrick Stedman," Defendants characterize Stedman's correspondence as a Surreply and moved to strike the Surreply on March 26, 2019. (ECF No. 21).

Surreply memoranda are not permitted to be filed absent an Order by this Court. See Local Rule 105.2(a) (D.Md. 2018). However, "[s]urreplies may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." Khoury v. Meserve, 268 F.Supp.2d 600, 605 (D.Md. 2003) (citing Lewis v. Rumsfeld, 154 F.Supp.2d 56, 61 (D.D.C. 2001)), aff'd, 85 F.App'x 960 (4th Cir. 2004).

In his Surreply, Stedman states that he argued in his Opposition that Defendants' were presenting a false argument regarding his October 19, 2017 sick-call visit. (Pl.'s Mar. 14, 2019 Correspondence ["Pl.'s Surreply"] at 1, ECF No. 20). At the time he filed the pleading, Stedman claimed he was not able to access his medical records and was therefore unable to produce the sick-call slip in support of his argument. (Id.). Subsequently he was permitted access to his medical records and made copies of a October 17, 2017 sick-call slip, which he indicates initiated the October 19, 2017 sick-call encounter. (Id. at 3–4). Stedman has attached a copy to his Surreply.

## II.    DISCUSSION

### A.    Motion to Amend Pleadings

Pursuant to Federal Rule of Civil Procedure 15(a), "[a] party may amend its pleading once as a matter of course within 21 days after serving it, or if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed.R.Civ.P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed.R.Civ.P. 15(a)(2). "The court should freely give leave [to amend a complaint] when justice so requires." Fed.R.Civ.P. 15(a)(2). Coupled with this idea, there is a "federal policy in favor of resolving cases on the merits instead of disposing of them on technicalities." Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 379 (4th Cir. 2012) (quoting Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172, 193 (4th Cir. 2009)).

Although the federal rules favor granting leave to amend, the decision lies within the sound discretion of the district court. Medigen of Ky., Inc. v. Pub. Serv. Comm'n of W.Va., 985 F.2d 164, 167–68 (4th Cir.1993) (citing Nat'l Bank v. Pearson, 863 F.2d 322, 327 (4th Cir. 1988)). Leave to amend is properly denied when amendment would prejudice the opposing party, the moving party has exhibited bad faith, or amendment would be futile. Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos, 264 F.3d 424, 446 (4th

---

Considering Stedman's self-represented status together with his stated inability to procure the document before filing his Opposition, the Court will deny Defendants' Motion to Strike.

Cir. 2001) (citing <u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 242 (4th Cir. 1999)). Leave to amend would be futile when an amended complaint could not survive a motion to dismiss for failure to state a claim. <u>See</u> <u>Equal Rights Ctr. v. Niles Bolton Assoc.</u>, 602 F.3d 597, 603 (4th Cir. 2010); <u>U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.</u>, 525 F.3d 370, 376 (4th Cir. 2008).

Defendants filed their Motion on December 28, 2019. (ECF No. 11). The Court notified Stedman of Defendants' pending Motion by letter dated January 2, 2019, informing Stedman he had "seventeen (17) days from the date of this letter" to file a response to the Motion. (Jan. 2, 2019 Rule 12/56 Letter at 1, ECF No. 12). Stedman submitted his Motion to Amend on January 20, 2019. (ECF No. 15).

Defendants argue that Stedman's response was untimely and urge the Court to deny Stedman's Motion to Amend on the basis that it would be futile. Defendants' futility argument is unavailing, however, because the Court finds that Stedman's Motion to Amend was timely and accepts Stedman's amended pleading as a matter of course.

In reaching the conclusion that Stedman's Motion to Amend is timely, the Court relies on three considerations. First, although the Court's Case Management/Electronic Case Files ("CM/ECF") system shows that the Court received Stedman's Motion for Leave on January 28, 2019, the Certificate of Service on the Motion itself is dated January 20, 2019. (<u>See</u> Pl.'s Mot. Amend at 2, ECF No. 15). Second, because the last day of the seventeen-day period set forth in the Court's January 2, 2019 letter fell on January 19, 2019—a Saturday—Stedman reasonably had until the following Monday, January 21, 2019 to respond to Defendants' Motion. <u>See</u> Fed.R.Civ.P. 6(a) (instructing that, for the

purposes of computing any time period specified in a court order, a court should "include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday"). And third, at the very minimum, because the Court did not notify Stedman of Defendants' Motion until January 2, 2019, Stedman's Motion to Amend falls within the twenty-one-day period imposed by Rule 15(a), during which time a party may amend its pleading as a matter of course. Fed.R.Civ.P. 15(a). These facts, taken together with the Court's goal of resolving cases on the merits and not on technicalities, see Medigen, 985 F.2d at 167–68, counsels the Court to consider the supplemental allegations in Stedman's Motion to Amend. Because the Court finds that Stedman was permitted to file an Amended Complaint as a matter of law, the Court will consider Stedman's new allegations against Warden Bishop and as to Wexford's official policy or custom, and deny Stedman's Motion to Amend as moot.[23]

## B.    **Motion to Dismiss**

The purpose of a Rule 12(b)(6) motion is to "test[ ] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it

---

[23] Along with his Motion to Amend, Stedman also filed a Motion for Extension, seeking leave from the Court to file a response to Defendants' Motion by February 9, 2019. Because the Court finds that Stedman's response on January 20, 2019 was timely and will deny his Motion to Amend as moot, the Court will also deny Stedman's Motion for Extension as moot.

does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of America, N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd sub nom. Goss v. Bank of Am., NA, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But, the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

In their Motion, Defendants ask the Court to dismiss Stedman's § 1983 claims against Wexford for failure to state a claim because respondeat superior is not recognized

in § 1983 cases and Stedman has not sufficiently alleged that Wexford maintained an unconstitutional policy or procedure. The Court finds Defendants' arguments persuasive.

It is well-established that the doctrine of respondeat superior does not apply in § 1983 claims. See Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004). A private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. See Clark v. Md. Dep't of Pub. Safety and Corr. Servs., 316 F.App'x 279, 282 (4th Cir. 2009); Austin v. Paramount Parks, Inc., 195 F.3d 715, 727–28 (4th Cir. 1999); Powell v. Shopco Laurel Co., 678 F.2d 504, 506 (4th Cir. 1982). Rather, a private corporation carrying out a government function, such as the delivery of medical care in a prison setting, may be sued under § 1983 for constitutional deprivations only if they result from a policy, custom, or practice of the entity. Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). To show a policy or custom, the plaintiff must allege and prove: (1) the existence of an official policy or custom; (2) that is fairly attributable to the defendant; and (3) that proximately caused the underlying violation of the plaintiff's rights. See Monell, 436 U.S. at 690; Jordan ex rel. Jordan v. Jackson, 15 F.3d 333, 338 (4th Cir. 1994).

In his Complaint, Stedman alleges that Wexford medical staff violated his First and Eighth Amendment rights by denying him medication and refusing to turn over his medical records. Although Stedman later alleged that "Wexford's unethical practice[s] and procedur[es] . . . created the environment for [Stedman's] unconstitutional civil rights violation[,]" (see Mot. Amend at 1, ECF No. 15), Stedman does not identify a specific policy or custom attributable to Wexford, nor does he allege how any of Wexford's

ostensible policies or procedures proximately caused a violation of his rights. Further, although Stedman adds Warden Bishop as a defendant, (see Mot. Amend at 1), he fails to support his claim with any specific allegations as to Warden Bishop. Wexford and Warden Bishop cannot be held liable for the acts of Wexford employees under a theory of respondeat superior. Thus, Stedman has not stated a viable § 1983 claim against Wexford or the Warden. Accordingly, this Court will dismiss Stedman's claims against Wexford and Warden Bishop.

## C.     Motion for Summary Judgment

Turning to Stedman's remaining claims against Pierce, for which Defendants attached extra-pleading evidence such as Stedman's medical records and affidavits from Stedman's medical providers, the Court must decide whether it will convert Defendants' Motion to a motion for summary judgment.

Defendants style their Motion as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Rule 56, and attach extra-pleading. A motion styled in this manner implicates the Court's discretion under Rule 12(d). See Kensington Vol. Fire Dept., Inc. v. Montgomery Cty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd sub nom., Kensington Volunteer Fire Dep't. v. Montgomery Cty., 684 F.3d 462 (4th Cir. 2012). Pursuant to Rule 12(d), when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion. First, that the "parties be given some indication

by the court that it is treating the 12(b)(6) motion as a motion for summary judgment" and second, "that the parties first 'be afforded a reasonable opportunity for discovery.'" Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013) (quoting Gay v. Wall, 761 F.2d 175, 177 (4th Cir. 1985)).

When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005). "[T]he party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). Rule 56(d) provides that the Court may deny or continue a motion for summary judgment "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). "[T]he failure to file an affidavit under Rule 56[(d)] is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." Nguyen v. CNA Corp., 44 F.3d 234, 242 (4th Cir. 1995) (quoting Paddington Partners v. Bouchard, 34 F.3d 1132, 1137 (2d Cir. 1994)).

Here, Defendants caption their Motion in the alternative for summary judgment and attach matters beyond Stedman's Complaint for the Court's consideration. Furthermore, Stedman has not submitted a Rule 56(d) affidavit expressing a need for discovery. Accordingly, the Court will treat Defendants' Motion as a motion for summary judgment.

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)).

Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

### 1.      Analysis

Defendants argue that Stedman has failed to show that Pierce retaliated against him or that she was deliberately indifferent to Stedman's serious medical need. Stedman contends that he has. The Court considers each claim in turn.

### a.      First Amendment Retaliation

Stedman alleges that Pierce retaliated against him in violation of his First Amendment rights by refusing to refill his blood pressure medication and fraudulently doctoring his medical reports. Defendants contend that Stedman has not adequately proven his claim for retaliation. The Court agrees with Defendants.

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). To state

a claim of retaliation for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. See Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005).

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large, . . . incarceration does not divest prisoners of all constitutional protections." Shaw v. Murphy, 532 U.S. 223, 228–29 (2001). "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). Specifically, the Fourth Circuit has held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. Booker v. S.C. Dep't of Corr., 855 F.3d 533, 545 (4th Cir. 2017). A plaintiff can establish this element of retaliatory conduct if the defendant took an action that would "deter a person of ordinary firmness from the exercise of First Amendment rights." Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017) (quoting Constantine, 411 F.3d at 500). The plaintiff must also demonstrate a causal connection between his First Amendment activity and the alleged retaliatory action. See Constantine, 411 F.3d at 501. The showing can be based on circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity and that the retaliation took place within some "temporal proximity" of that activity. Id.

Although Stedman alleges he filed numerous ARPs against Pierce and that Pierce withheld his medication and altered his medical records, Stedman fails to demonstrate a causal connection between his First Amendment activity and the alleged retaliation. First, while Stedman alleges that "Pierce's attitude [has] been short and her follow through of my care [has] been deficient" since he filed the ARP, (Compl. at 8), Stedman has failed to demonstrate that Pierce actually knew about Stedman's grievance against her. Indeed, Pierce avers that she is not typically made aware of the nature of an ARP complaint filed against her or other medical staff. (Pierce Aff. ¶ 3). Further, Stedman's medical records demonstrate that despite Stedman's numerous ARPs against Pierce and other medical department staff, Stedman's providers, Pierce included, continued to timely respond to his sick-call slips, prescribe him medicine, provide diagnostic testing, and refer him to outside specialists. While Stedman's prescription blood pressure medication lapsed, the record shows that the lapse was due to Stedman's refusal to be seen by Pierce, not by any retaliatory conduct taken by her. Accordingly, the Court will grant summary judgment against Stedman as to his First Amendment retaliation claims against Pierce.

b.     **Eighth Amendment Claim**

Defendants argue that Stedman fails to establish a claim under the Eighth Amendment because he cannot show that Pierce was deliberately indifferent to Stedman's medical needs. The Court agrees with Defendants.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 173 (1976); see also Hope v. Pelzer, 536 U.S. 730, 737 (2002); Scinto v. Stansberry,

841 F.3d 219, 225 (4th Cir. 2016); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016).

"Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." De'Lonta v. Angelone, 330 F.3d 630, 633 (4th Cir. 2003) (citing Wilson v. Seiter, 501 U.S. 294, 297 (1991)); accord Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017). To prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Anderson, 877 F.3d at 543. A prisoner plaintiff must allege and provide some evidence he was suffering from a serious medical need and that defendants were aware of his need for medical attention but failed to either provide it or ensure it was available. See Farmer v. Brennan, 511 U.S. 825, 834–37 (1994); see also Heyer v. U.S. Bureau of Prisons, 849 F.3d 202, 209–10 (4th Cir. 2017); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). A serious medical condition is an illness or condition that is either life-threatening or causes an unnecessary infliction of pain when it is not treated properly. See e.g., Barnes v. Bilak, No. JKB-17-1057, 2018 WL 2289232, at *6 (D.Md. May 17, 2018) (finding that high blood pressure is a serious medical need); Johnson v. Quinones 145 F.3d 164, 168 (4th Cir. 1998) (finding that pituitary tumor is a serious medical need); Brown v. Harris, 240 F.3d 383, 389 (4th Cir. 2001) (finding that risk of suicide is a serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. See Farmer, 511 U.S. at 839–40; see also Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference because 'prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through other evidence that tends to establish the defendants knew about the problem. This includes evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." Scinto v. Stansberry, 841 F.3d 219, 226 (4th Cir. 2016) (quoting Farmer, 511 U.S. at 842).

Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. See Lightsey, 775 F.3d at 179 (holding that physician's act of prescribing treatment raises a fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Additionally, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." United States v. Clawson, 650

F.3d 530, 538 (4th Cir. 2011) (quoting <u>Bowring v. Godwin</u>, 551 F.2d 44, 47–48 (4th Cir. 1977)).

While this Court recognizes the seriousness of Stedman's chronic pain and his ongoing concerns about his health, there is no evidence that Defendants refused to take appropriate action to treat his conditions. Rather, Pierce and other Wexford medical personnel took several steps to address each of Stedman's health issues, including ordering laboratory tests and other diagnostic testing such as x-rays, a CT scan, several EKGs, a stress test, and an echocardiogram. Stedman's providers also prescribed him various medications to treat his diagnosed conditions and symptoms. Additionally, Stedman's providers referred him for consultations with a cardiologist and a neurologist. Although the request for referral to an ENT was denied by collegial review, Stedman's providers nonetheless proceeded with a more conservative course of treatment.

Additionally, Stedman's medical records show he frequently stopped taking his prescription medicine without consulting medical providers and refused to move forward with recommended lifestyle changes, apparently because he disagreed with the proposed treatments. While at times it is apparent that Stedman's prescriptions lapsed or he was not provided with the medication prescribed, there is no evidence that the lapse in prescriptions or failure to deliver the medication was due to any conduct on the part of Defendant Pierce. To the contrary, the largest lapse in Stedman's prescription occurred due to Stedman's own conduct in refusing to be seen by Pierce and then complaining about the failure to receive his medication through the ARP process rather than through the sick-call process, further delaying the renewal of his medication. Absent extraordinary circumstances not present

here, Stedman's disagreement with the course of care provided does not amount to deliberate indifference to his serious medical needs. Accordingly, the Court will grant summary judgment against Stedman as to his Eighth Amendment retaliation claims against Pierce.

### c.     HIPAA Violation

Finally, Stedman alleges that Pierce violated his rights under HIPAA by discussing Stedman's medical conditions with a fellow inmate. Although Defendants do not specifically refute Stedman's HIPAA claim in their briefs, (see Defs.' Mot.; Defs.' Reply, ECF No. 18), the Court will nonetheless consider whether this claim withstands Defendants' Motion.

The Court need not address this claim in detail, however, as the weight of authority in the Fourth Circuit holds that HIPAA does not provide for a private right of action. Van Higgins v. Miller, No. 1:12CV297, 2012 WL 4511524, at *2 (W.D.N.C. Oct. 1, 2012) (citing Standiford v. Rodriguez-Hernandez, No. 5:10CV24, 2010 WL 3670721, at *4 (N.D.W.Va. Sept. 20, 2015) ("Because HIPAA does not provide for a private right of action, however, the plaintiff has not stated a cognizable claim."); Carte v. United States, No. 2:07-0515, 2010 WL 3259420, at *8 (S.D.W.Va. Aug. 18, 2010) (granting the defendant's motion for summary judgment and holding that no private right of action exists under HIPAA)). Accordingly, Stedman's claim under HIPAA also fails.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss or in the Alternative for Summary Judgment (ECF No. 11), construed in part as a motion for summary judgment, and Defendants' Motion for Leave to File Pleading in Excess of 35 Pages (ECF No. 10) are GRANTED; Stedman's Motion to Amend Pleadings or Consent Request to Defendants to Allow Amendment or in the Alternative Motion for Leave to Amend (ECF No. 15) and Stedman's Motion for Extension of Time (ECF No. 13) are DENIED AS MOOT; Stedman's Motion to Appoint Counsel (ECF No. 14) is DENIED; and Defendants' Motion to Strike Surreply (ECF No. 21) is DENIED. A separate Order follows.

Entered this 30th day of September, 2019.

_____/s/_____
George L. Russell, III
United States District Judge